## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NEW YORK

Ronald D. Coleman (RC 3875)
**GOETZ FITZPATRICK LLP**
One Penn Plaza—Suite 4401
New York, New York 10119
(212) 695-8100
rcoleman@goetzfitz.com
*Attorneys for Plaintiff*

| | |
|---|---|
| **TANFASTIC, INC.,** | CIVIL ACTION NO. |
| Plaintiff, | 09-CV-_____ ( ____ ) |
| - vs. - | |
| **NEW SUNSHINE, LLC, AUSTRALIAN GOLD, LLC, DESIGNER SKIN, LLC, CAL-TAN, LLC, TAN INTERNATIONAL CORPORATION, FOUR SEASONS SALES & SERVICE, INC., STAY TAN NORTH, INC. and JOHN DOES 1-5,** | **COMPLAINT** |
| Defendants. | |

Plaintiff, Tanfastic, Inc. ("Tanfastic"), by and through its undersigned attorneys, for its complaint against defendants New Sunshine, LLC, Australian Gold, LLC, Designer Skin, LLC, and Cal Tan, LLC, alleges as follows:

### THE PARTIES

1.      Plaintiff Tanfastic, Inc. ("Tanfastic") is a New York corporation with a principal place of business at 40 Bridge Street, Corning, New York.

2.      Defendant New Sunshine, LLC, is an Indiana company that manufactures indoor tanning-related preparations and products including indoor tanning lotion, with a principal place of business at 6270 Corporate Drive, Suite 250, Indianapolis, Indiana ("New Sunshine").

3.    Defendant Australian Gold, LLC is an Indiana company that is, upon information and belief, wholly owned by New Sunshine and has its principal place of business at the same location as New Sunshine ("Australian Gold").

4.    Defendant Designer Skin, LLC, is an Arizona company that is, upon information and belief, wholly owned by New Sunshine has its principal place of business at 1325 West 21st Street, Tempe, Arizona ("Designer Skin").

5.    Defendant Cal Tan, LLC is an Arizona company that is, upon information and belief, wholly owned by New Sunshine has its principal place of business at the same location as New Sunshine ("Cal Tan").

6.    Defendant Tan International Corporation is an Arizona corporation with a principal place of business at 4111 North 7th Avenue, Phoenix, Arizona ("Tan International").

7.    Defendant Four Seasons Sales & Service, Inc. is a Tennessee corporation with its principal place of business at 2350 Lakeway Circle, Paris, Tennessee ("Four Seasons").

8.    Defendant Stay Tan North, Inc. is a New York corporation with its principal place of business at 1 Elm Street, Suite A, Locust Valley, New York ("Stay Tan North").

9.    John Does 1 through 5 are as-yet unidentified participants, including upon information and belief corporate or natural persons, in the unlawful activities described herein.

**JURISDICTION AND VENUE**

10.    This Court has subject matter jurisdiction under 15 U.S.C. §§ 15, 26, 1121, 1125(a) and 28 U.S.C. §§ 1331, 1337, 1338(a) and 2201, in that this case arises under the antitrust laws and the trademark laws of the United States, the Federal Declaratory Judgment Act and pursuant to the principles of supplemental jurisdiction, 28 U.S.C. § 1367.

11.    Personal jurisdiction over defendant Stay Tan North is vested in this Court because it is a New York corporation doing business in the State of New York.

12.    Personal jurisdiction over the other defendants is vested in this Court in part because the claims alleged arise from acts and conduct defendants purposefully directed towards plaintiff, a New York resident.

13.    Venue is proper in the United States District Court for the Western District of New York pursuant to 28 U.S.C. §1121 (b) and (c) and § 1391 and 15 U.S.C. §§ 15 and 22.

## FACTS

14.    All the parties named herein are involved in the sale and marketing of indoor tanning preparations or lotions.

15.    In contrast to over-the-counter sunscreen products, which are regulated by the United States Food and Drug Administration as drugs, indoor tanning lotions as such are not regulated by any government agency in the United States.

16.    The U.S. indoor tanning market is estimated to be worth at least $5 billion at the retail level.

17.    In 2006 and 2007, New Sunshine's Australian Gold division acquired its top two competitors, namely defendants Designer Skin and Cal Tan.

18.    Upon information and belief, New Sunshine now controls 80 percent of this multi-billion-dollar market.

19.    New Sunshine's business model depends in large part in a heavy investment in marketing, advertising, graphics, and an overall program of brand development premised on the concept that its brands are "premium" products worthy of sales prices wildly out of proportion to their manufacturing cost.

20.    Though burdened by debt, New Sunshine maintains high marginal profit margins by complementing its aggressive marketing program with rigid control over all aspects of distribution of its products.

21.     New Sunshine's maintenance of control over all aspects of distribution of its products includes rigid control over its distributors.

22.     New Sunshine's control over distribution and marketing is part of an aggressive and frank, though unwritten, program of resale price maintenance.

23.     To ensure total control over its distribution network, New Sunshine requires its distributors to agree to exclusive distribution policies that permit sales only to a narrowly-defined segment of businesses described as "tanning salons."

24.     These policies also facially forbid distributors from selling New Sunshine lotions to non-tanning-salon retail outlets, including wholesale stores, pharmacies, beauty supply stores, flea markets and the Internet.

25.     The exclusive distribution policies do not merely restrict sales to what seem at first blush to be plainly identified "tanning salons," however.

26.     In the "fine print," New Sunshine's exclusive distribution policies give New Sunshine the absolute right to forbid sales by a distributor to any person or business, including any tanning salon otherwise qualified under the purportedly neutral definition of an eligible purchaser.

27.     In fact, these policies are the key instrumentalities of a cartel that controls the sales and distribution, and, as a practical matter, retail sales and pricing of New Sunshine products, which as stated above collectively constitute an estimated 80% of the market for indoor tanning products (the "New Sunshine Cartel" or the "Cartel").

28.     As a cover for its anticompetitive practices, New Sunshine claims publicly that the purpose of the Exclusive Distribution Policies is to ensure that consumers receive proper instruction from the supposedly highly qualified professionals employed at tanning salons.

29.     In fact, this claim is entirely specious.

30.     For example, New Sunshine has not made, and makes, no effort to collect data concerning the educational level, training, turnover or age of tanning salon employees.

31.     There are also virtually no licensing, training or certification requirements necessary to work at a tanning salon.

32.     Moreover, despite its claimed obsession with safety, New Sunshine does not require on its own accord that tanning salon employees obtain certification, training or indeed have any qualifications at all in order to be "authorized purchasers" of their products.

33.     In fact most tanning salon employees are typically not specially trained persons or experts.

34.     Thus, a leading indoor tanning publication recommends that in a tanning salon, "A salesperson should be paid between 85 cents to a $1.25 above minimum wage per hour plus commission."

35.     Moreover, the premise that tanning salon personnel can be relied on to provide expert advice and guidance is belied by empirical research.

36.     For example, a 2003 study from the University of Washington School of Medicine and elsewhere, involving 50 North Carolina tanning facilities and published in the *Journal of the American Academy of Dermatology*, found that 95 percent of novice tanners using those facilities were exposed to UV radiation for a longer time than the federally recommended levels. Moreover, one-third of the study's participants started at or above the maximum exposure limits for already tanned people.

37.     Similarly, a study published in 2001 in the same journal by researchers at San Diego State University and elsewhere found that none of 54 San Diego area facilities in the study complied with all FDA rules and recommendations on length and frequency of indoor tanning, and that 94 percent allowed more-frequent sessions than the FDA recommends.

38. Together, these studies suggest that, contrary to the suggestion by New Sunshine, tanning salons and their employees are biased in favor of selling more services and products than may be optimal for consumers.

39. On the other hand, by all indications regular users of indoor tanning products typically acquire the knowledge necessary to use them properly through self-education.

40. For this reason, there have been very few reported incidents of injuries or serious adverse reactions arising from the use of indoor tanning lotion by consumers.

41. The foregoing makes clear that New Sunshine devotes the resources that it does, as detailed below, to restricting distribution of its products to tanning salons not to protect consumers, as claimed, but to protect its Cartel profits.

42. Although New Sunshine distributors, including the defendants, are knowingly members of the New Sunshine Cartel, their role in the cartel varies according to whether, and to what extent, they enjoy favored status with New Sunshine.

43. This status and a given distributor's attitude toward its customers, including those that are deemed "unauthorized resellers" by the New Sunshine Cartel, may change over time depending on various factors.

44. In some markets, and with respect to some products, certain "unauthorized resellers," such as Tanfastic, are *de facto* distributors who sell to tanning salons and to other retailers.

45. These "unauthorized resellers," such as Tanfastic, typically must act under the cover of assumed names, false delivery drop-off points and other legerdemain in order to evade the "enforcement" techniques of the cartel, and specifically New Sunshine.

46. New Sunshine, in turns, publicly, and in litigation, paints the "deceptive practices" of utilized by "product diverters" and "unauthorized resellers" to protect their livelihoods from the Cartel's anticompetitive practices as proof of bad faith and intentional wrongdoing.

47.    For their part, New Sunshine distributors benefit directly from the existence of the New Sunshine Cartel, because it reduces competition from "unauthorized resellers" who can undersell them, providing better prices to retailers.

48.    The Cartel's effect of limiting supply of New Sunshine products to the retail market also makes distributors' franchises more valuable.

49.    On the other hand, as with all cartels, each individual participant in the New Sunshine Cartel has an irresistible incentive to encourage and enforce compliance by others while violating cartel rules itself.

50.    By such a strategy, each Cartel member seeks to "free ride" on the discipline of its fellows and not only reap the expected cartel benefits while maximizing its own sales and revenue, but to gain enhanced financial reward for "cheating" by virtue of the artificial scarcity the Cartel otherwise creates.

51.    Because "unauthorized" purchasers, such as Internet resellers, buy New Sunshine products in bulk and seek bargain pricing, distributors are usually very willing to ship even low-margin sales of large quantities to such resellers.

52.    Distributors also qualify for significant rebates, credits and other incentives from New Sunshine, including no less than eligibility for continuation as a distributor, by reaching certain contractually-set sales levels.

53.    A New Sunshine distributorship's entire annual profitability may be premised on volume-based year-end incentives and bonuses.

54.    Failure to meet these sales levels therefore can destroy a distributorship and, with it, typically an entire family's financial support and its future, as well as the employment of numerous people employed by it.

55.     Distributors, therefore, have every incentive to surreptitiously sell as much merchandise as possible without getting caught by New Sunshine.

56.     Thus virtually all New Sunshine distributors make "unauthorized" sales in a "willfully blind" manner, i.e., avoiding, or pretending to avoid, "knowing" that their customers are not really "authorized" tanning salons in order to appear as if they are maintaining cartel discipline.

57.     Indeed, New Sunshine distributors not only accept orders from "unauthorized resellers," but actively solicit them.

58.     In fact, many New Sunshine distributors and subdistributors surreptitiously sell New Sunshine products themselves through their own "unauthorized" websites and otherwise.

59.     New Sunshine knows that without "unauthorized sales" virtually none of its distributors could survive and looks the other way at what it publicly decries under the cynical term "diversion," it may without warning intensify scrutiny on one or more of its distributors for its particular strategic needs of the moment.

60.     New Sunshine can do this because the literal terms of the New Sunshine Cartel Policy itself as enunciated in the exclusive distribution policies give immensely broad discretion to New Sunshine.

61.     Under the terms of their contracts, distributors are always vulnerable to suspension, audit, alteration of their credit terms or termination of their distributorships, and therefore must at least feign cooperation with the New Sunshine Cartel policy and otherwise surrender all commercial prerogatives to New Sunshine.

62.     New Sunshine's discretion is so broad and these contractual requirements so extensive that, for all practical purposes, New Sunshine distributors are always in technical non-compliance with their distribution agreements or could be declared to be in breach by New Sunshine on one or another previously-ignored technical pretext.

63.     This is true whether or not distributors are caught selling products to "unauthorized resellers."

64.     Indeed, New Sunshine distribution agreements provide not only for strict terms of cartel compliance, but for prohibitive penalties, including attorneys fees and costs, to be imposed on any distributor that dares assert or defend itself legally against New Sunshine.

65.     Thus New Sunshine distributors may, depending on the exigencies of the moment, accept or even solicit orders from "unauthorized" purchasers, including purchasers on New Sunshine's feared "do not sell" list, and yet later compromise these customers' livelihoods by revealing their identities, locations or purchase methods when required to do so by New Sunshine.

66.     On information and belief, New Sunshine distributors even participate in "stings" and traps to elicit sensitive information from "unauthorized" resellers and further draw them out to the attention of New Sunshine.

67.     This, in turn, leads to the use of a key method of New Sunshine to maintain cartel discipline, namely pressuring the most vulnerable Internet retailers themselves with the threat or initiation of litigation on obviously specious legal grounds.

68.     New Sunshine's strategy is to utilize knowingly baseless litigation premised on a laundry list of unsustainable claims to identify and choke off, by a cascade of additional threats, all sources of merchandise identified through discovery.

69.     For example, New Sunshine, through its counsel and otherwise, knowingly issues meritless written legal threats against "unauthorized" Internet retailers of New Sunshine tanning lotion based on untenable claims of copyright and trademark infringement and other varieties of business torts to intimidate what are typically small businesses with the prospect of costly legal defense and the remote possibility of legal liability, including promises of "endless" appeals and the filing of serial litigations.

70.    New Sunshine's misrepresentations and threats, sent by counsel and otherwise, also typically include false characterizations of past litigation "successes" in its "diversion" campaign, as well as statements of what New Sunshine purports to be facts "known" to it, either with no basis at all or in some cases despite contrary facts known to it, as to the source of the recipients' supply of New Sunshine lotion and the nature of their businesses.

71.    New Sunshine gambles, and frequently successfully, that by characterizing "unauthorized retailers," i.e., competitors of their preferred distribution channels, as "diverters," pirates and wrongdoers, they will be able to sustain sufficient litigation "steam" to utilize the litigation process as an alternative to economic competition and to thereby maintain the Cartel and the profits of itself and its fellow members.

72.    Distributors and "subdistributors" who have been operating without written distributorship agreements for years have even been required by New Sunshine to enter into written agreements for the sole purpose of utilizing those agreements as evidence of "contracts" with which "unauthorized resellers" have supposedly "interfered" via actual "inducement."

73.    In at least one such case involving a "subdistributor" with no written agreement with either New Sunshine or even a New Sunshine distributor, New Sunshine drafted an agreement, including the Cartel policy, to retroactively go into effect between the subdistributor and a New Sunshine distributor, which was back-dated and deemed retroactive for purposes of litigation.

74.    That subdistributor was defendant Stay Tan North, which cooperated with New Sunshine to put out of business a reseller of New Sunshine lotions by providing helpful and misleading, if not perjured, testimony in litigation.

75.    Stay Tan North itself for years was on information and belief not only a willing seller of New Sunshine products to all comers, but sold New Sunshine products to consumers over the Internet itself.

76.    Stay Tan North's cooperation with New Sunshine included having its principal testify that although he had never met, spoken to or dealt with anyone from the Internet reseller, he nonetheless had, by virtue of filling orders for New Sunshine products placed by a third party, been "induced" by that third party, the Internet reseller, to commit a "breach of contract" which but for that "inducement" he would never have committed.

77.    During that litigation, Stay Tan North's own website link for Internet sales of New Sunshine tanning lotion, which was operational at the beginning of the trial, disappeared from its website and its previous operation as an unrestricted sales outlet was denied under oath.

78.    Stay Tan North's actions were purposeful and knowing, but upon information and belief were done under pressure by New Sunshine of the nature described above.

79.    Despite the "admission" by Stay Tan North that it had breached its alleged contract and committed "diversion," Stay Tan North remained at all times and remains today an active subdistributor for New Sunshine.

80.    Another recipient of a communication threatening similar relentless litigation is plaintiff Tanfastic.

81.    Tanfastic sells tanning lotions, including many "national" brand-name indoor tanning lotions, at a discount via various Internet websites, including its flagship website found at www.tanfastic.com ("Tanfastic.com").

82.    All New Sunshine tanning lotions sold by Tanfastic on the Internet are known by Tanfastic to be genuine.

83.    All the tanning lotions sold by Tanfastic on the Internet are purchased by Tanfastic in a lawful manner.

84.    Tanfastic sells tanning lotions, including genuine New Sunshine lotions, both to consumers and in some cases to tanning salons, because it is frequently able to offer better selection and price than authorized distributors.

85.    Over the years, New Sunshine and one or more of its predecessors, including what is now defendant Australian Gold, as well as other subsidiaries or affiliates of New Sunshine or their predecessors, have used the techniques set out above, in concert with some or all of the other defendants, to interfere with the contracts, prospective contracts and the prospective economic benefit of Tanfastic.

86.    The defendants have done this by intimidating or threatening Tanfastic's suppliers into ceasing to provide products, and in some cases by pretending to cooperate, transmitting confidential information regarding Tanfastic's business to New Sunshine or its counsel or otherwise acting in furtherance of their anticompetitive practices and in order to maintain cartel discipline.

87.    Most recently, on May 21, 2009, Scott Matthews, counsel for New Sunshine, transmitted a letter to Tanfastic's owner, Allan Hall, by email and certified mail (the "Matthews Letter"), stating that his letter "constitutes notice" that Mr. Hall was "in contempt" of certain court orders in connection with Tanfastic's lawful sale of New Sunshine tanning lotion on the Internet.

88.    The assertions in the Matthews Letter that Mr. Hall is "in contempt" of the two foreign state orders enclosed, as well as the characterizations of the provisions and enforceability of those orders as to Mr. Hall and Tanfastic, are grossly misleading at best.

89.    One order enclosed with the Matthews Letter is from a state court in Arizona, arising from a default judgment taken by defendant Designer Skin against third parties. Neither Tanfastic nor Mr. Hall are parties to that injunction, nor are they acting in concert with nor in involved in any way with the parties enjoined.

90.     The other order enclosed with the Matthews Letter is a 2001 action in Indiana state court brought by the predecessor of defendant Australian Gold against Tanfastic, Inc.  The Indiana order, however, is on its face fatally deficient in various respects, not the least of which  includes the court's present jurisdiction over either Tanfastic or Mr. Hall, which it does not appear to have.

91.     The Matthews Letter goes on to demand that Tanfastic (1) immediately cease selling not only the brands allegedly prohibited for sale under the two injunctions, but all tanning lotion brands of all the New Sunshine companies, including not only such brands presently in existence but those which the company may introduce in the future; (2) remove "all references" to New Sunshine products from all its websites; (3) identify "all sources from whom you purchased the Products and provide supporting documentation"; and (4) enter into a new written agreement with New Sunshine.

92.     The Matthews Letter also states, "[Y]our acquisition and sale of the Cal Tan products gives rise to a new cause of action against you for tortious interference with our distributorship agreements, trademark infringement and unfair competition.  Our distributorship agreements permit the sale of our lotions only to tanning salons.  Your acquisition of the products from our distributors interferes with our distributorship agreements."

93.     Additionally, the Matthews Letter then goes on to claim that New Sunshine has been "very successful trying similar cases in the past against persons similarly situated to you," continuing in a similar vein, in a paragraph rife with omissions and distortions.

94.     The purpose of the Matthews Letter, in short, is to mislead plaintiff and intimidate it into foregoing not only those rights the letter claims, inaccurately, to be governed by the supposed injunctive restraints on plaintiff, but a host of additional rights involving literally countless other products and, in short, to force plaintiff out of business.

95.     The Matthews Letter threatens legal action against Mr. Hall and Tanfastic unless they comply with New Sunshine's demands.

96.    The purposes of the third demand in the Matthews Letter, i.e., that Tanfastic identify the "sources" from which Tanfastic purchases its merchandise, are manifold.

97.    Fundamentally, the insistence that Tanfastic "turn in" its suppliers answers to the prime directive of a cartel, namely identification and punishment of "cheaters" to maintain Cartel discipline and keep prices at the targeted level.

98.    But New Sunshine also seeks the names of Tanfastic's suppliers so that it can again interfere with, and if possible completely destroy, Tanfastic's contracts and prospective future business, and eliminate Tanfastic's ability to sell New Sunshine products in the future.

99.    Defendant distributors Tan International, Four Seasons, Stay Tan North, and John Does 1-5 have knowingly participated and colluded in the actions of the New Sunshine Cartel as set forth above.

100.    Thus, in the relevant market, the United States, defendants have colluded to restrain trade by setting prices, monopolizing and seeking to monopolize, by a concerted refusal to deal and other anticompetitive behavior.

101.    Furthermore, because of its fear that defendants would, as they have so many times in the past regarding others, cripple lawful competition to the New Sunshine Cartel by its technique of utilizing bad faith litigation claims as a method of identifying and destroying its suppliers, plaintiff brings the instant action on this date.

## FIRST CAUSE OF ACTION
### Tortious Interference with Contract

102.    Plaintiff incorporates by reference the allegations contained in the foregoing paragraphs.

103.    Tanfastic has had in the past, and has at present, valid contractual relationships between itself and numerous persons and firms to sell New Sunshine products to Tanfastic.

104.    The existence of these contractual relationships is acknowledged by defendant New Sunshine via the Matthews Letter.

105.    These sources of New Sunshine products came into possession of New Sunshine products lawfully.

106.    These sources of New Sunshine products entered voluntarily into their contracts with Tanfastic, without unlawful inducement.

107.    Some or all of these sources of New Sunshine products, including but not limited to tanning salons, had no contract with New Sunshine or any other person restricting their right or ability to sell New Sunshine products to Tanfastic.

108.    No other legal obligation to third parties or other legal restriction governed Tanfastic's legal right to buy New Sunshine products from these sources.

109.    Defendants were aware of these contracts.

110.    Defendants' intentional acts, as alleged above, were designed to induce a breach or disruption of the contractual relationship between Tanfastic and these parties.

111.    Defendants' actions were not done in and are not consonant with the ordinary course of lawful business competition.

112.    Defendants' actions resulted in one or more actual breaches or disruption of the contractual relationship between Tanfastic and these parties.

113.    Defendants' actions have caused damage to Tanfastic due to a loss in revenue, a loss in profit and increased operating costs, in an amount to be determined at trial.

114.    Defendants' actions as alleged herein have caused and will continue to cause irreparable damage and injury to Tanfastic if not enjoined by this Court.

115.    Tanfastic has no adequate remedy at law.

## SECOND CAUSE OF ACTION
### Tortious Interference with Prospective Economic Advantage

116.    Plaintiff incorporates by reference the allegations contained in the foregoing paragraphs.

117.    Because of the intentional actions of defendants, some or all past and prospective future sources of New Sunshine products, including but not limited to tanning salons, which have had no contract with New Sunshine or any other person restricting their right or ability to sell New Sunshine products to Tanfastic, have nonetheless refused to do so.

118.    But for defendants' actions, these sources of New Sunshine products would have voluntarily, and without compulsion or need for inducement, sold the same to Tanfastic.

119.    Defendants' intentional acts, as alleged above, were designed to induce a breach or disruption of the contractual relationship between Tanfastic and these parties.

120.    Defendants' actions were done maliciously and unethically, with an intent to harm Tanfastic.

121.    Defendants' actions were not done in and were not consonant with the ordinary course of lawful business competition.

122.    Defendants' actions resulted in one or more actual breaches or disruption of the contractual relationship between Tanfastic and these parties, as well as the prospect for future purchases of New Sunshine products by Tanfastic.

123.    Defendants' actions have caused damage to Tanfastic due to a loss in revenue, a loss in profit and increased operating costs, in an amount to be determined at trial.

124.    Defendants' actions as alleged herein have caused and will continue to cause irreparable damage and injury to Tanfastic if not enjoined by this Court.

125.    Tanfastic has no adequate remedy at law.

### THIRD CAUSE OF ACTION
**Violation of the Donnelly Act – Retail Price Maintenance**
**(General Business Law § 340 *et seq.*)**

126.     Plaintiff incorporates by reference the allegations contained in the foregoing paragraphs.

127.     As set out in the foregoing allegations, defendants have established or maintained a contract, arrangement or combination whereby competition has been restrained with respect to the market for high-end or premium indoor tanning lotion and for New Sunshine products, which across all product lines constitute 80% of the indoor tanning market.

128.     As a result of this contract, arrangement or combination, retail prices for such products are maintained at an artificially high level, to the detriment of consumers and others.

129.     As a result of this contract, arrangement or combination, defendant and other Internet retailers, who have a lawful right to buy and sell such products, are unlawfully restrained from doing so.

130.     There is no pro-competitive justification for defendants' actions.

131.     Plaintiff has suffered and will, unless relief is granted by this Court, continue to suffer damages from the continuation and effects of this contract, arrangement or combination, which is a violation of General Business Law § 340 *et seq.* prohibiting vertical price fixing.

### FOURTH CAUSE OF ACTION
**Violation of the Donnelly Act – Monopolization**
**(15 U.S.C. § 2, 15, 26; General Business Law § 340 *et seq.*)**

132.     Plaintiff incorporates by reference the allegations contained in the foregoing paragraphs.

133.     As set out in the foregoing allegations, defendants have established or maintained a contract, arrangement or combination whereby competition has been restrained with respect to the

market for high-end or premium indoor tanning lotion and for New Sunshine products, which across all product lines constitute 80% of the indoor tanning lotion market.

134.    As set forth above, the foregoing activities of defendants have taken place in and substantially affected interstate commerce.

135.    Defendant New Sunshine LLC possesses monopoly power in the indoor tanning lotion market in the United States.

136.    Defendant New Sunshine LLC has, by the acts alleged above, willfully acquired or maintained monopoly power in this market.

137.    Plaintiff competes with the New Sunshine Cartel both as a distributor and retailer of New Sunshine products.

138.    As a result of New Sunshine's actions, defendant and other Internet retailers, who have a lawful right to buy and sell high-end tanning lotion products, including New Sunshine products, on the Internet, are unlawfully restrained from doing so, have paid excessively high prices for such products, have been injured by defendants' refusal to deal with them and have been deprived of the benefit of free competition in the relevant market.

139.    There is no competitive justification for defendants' actions.

140.    Plaintiff has suffered and will, unless relief is granted by this Court, continue to suffer damages, including a loss of revenue, loss of profits and increased operating costs, as a result of the continuation and effects of this contract, arrangement or combination, which is a violation of 15 U.S.C. § 2 and General Business Law § 340 *et seq.* prohibiting monopolies.

## FIFTH CAUSE OF ACTION
### Violation of the Donnelly Act – Attempted Monopolization
**(15 U.S.C. § 2, 15, 26; General Business Law § 340 *et seq.*)**

141.    Plaintiff incorporates by reference the allegations contained in the foregoing paragraphs.

142.    As set out in the foregoing allegations, defendants have attempted to establish or maintain a contract, arrangement or combination whereby competition will be been restrained with respect to the market for high-end or premium indoor tanning lotion and for New Sunshine products, which across all product lines constitute 80% of the indoor tanning lotion market in the United States.

143.    Defendant New Sunshine LLC has, by the acts alleged above, attempted to achieve monopoly power in the indoor tanning lotion market by predatory or anti-competitive conduct.

144.    Defendant New Sunshine LLC has, by the acts alleged above, willfully, and with specific intent, attempted to maintain monopoly power in this market.

145.    Plaintiff competes with the New Sunshine Cartel both as a distributor and retailer of New Sunshine products.

146.    Defendant New Sunshine LLC has, by the acts alleged above, willfully, and with specific intent, conspired with the other defendants in this action to maintain monopoly power in this market.

147.    There is a dangerous probability that, by the continuation of the actions described above, New Sunshine will achieve monopoly power.

148.    There is no competitive justification for New Sunshine's actions.

149.    Plaintiff has suffered and will, unless relief is granted by this Court, continue to suffer damages, including a loss of revenue, loss of profits and increased operating costs, as a result of the continuation and effects of this contract, arrangement or combination, which is a violation of 15 U.S.C. § 2 and General Business Law § 340 *et seq.* prohibiting monopolies and attempts or conspiracies to monopolize.

**SIXTH CAUSE OF ACTION**
**Violation of the Donnelly Act – Refusal to deal**
**(15 U.S.C. § 1, 15, 26; General Business Law § 340 *et seq.*)**

150.    Plaintiff incorporates by reference the allegations contained in the foregoing paragraphs.

151.    As set out in the foregoing allegations, defendants have established or maintained a contract, arrangement or combination whereby competition has been restrained with respect to the ability of plaintiff to purchase New Sunshine products for lawful resale.

152.    The New Sunshine Cartel has, by the acts alleged above, engaged in a concerted refusal to deal or group boycott in order to prevent competition by plaintiff.

153.    As a result of New Sunshine's actions, defendant and other Internet retailers, who have a lawful right to buy and sell high-end tanning lotion products, including New Sunshine products, on the Internet, are unlawfully restrained from doing so.

154.    Plaintiff competes with the New Sunshine Cartel both as a distributor and retailer of New Sunshine products.

155.    There is no competitive justification for defendants' actions.

156.    Plaintiff has suffered and will, unless relief is granted by this Court, continue to suffer damages from the continuation and effects of this contract, arrangement or combination, which is a violation of General Business Law § 340 *et seq.* prohibiting monopolies.

**SEVENTH CAUSE OF ACTION**
**Declaratory Judgment of Trademark Non-Infringement**
**(28 U.S.C. §2201)**

157.    Plaintiff incorporates by reference the allegations contained in the foregoing paragraphs.

158.    Plaintiff's use of the various product names and brand names of New Sunshine products is fair use and does not infringe any trademark.

159.    Plaintiff's use of the various product names and brand names of New Sunshine products is protected under the first sale doctrine does not infringe any trademark.

160.    Plaintiff's use of the various product names and brand names of New Sunshine products does not damage New Sunshine and does not infringe any trademark.

161.    Plaintiff's use of the various product names and brand names of New Sunshine products does not cause a likelihood of confusion and does not infringe any trademark.

162.    By accusing plaintiff of federal and state trademark infringement, defendants have created a present and actual controversy between the parties.

163.    Defendants' actions have caused plaintiff to bring this action which is the only means for it to maintain its lawful sale of New Sunshine products.

164.    Plaintiff's remedy at law, in the event defendants seek or obtain a preliminary injunction, is not adequate to compensate it for the injuries threatened or inflicted by defendants.

165.    Plaintiff requests that this Court declare and adjudicate the parties' respective rights and duties with respect to plaintiff's fair use of the trademarks owned, associated with, or allegedly owned by defendants.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Tanfastic, Inc. prays for judgment against defendants New Sunshine, LLC, Australian Gold, LLC, Designer Skin, LLC, Cal Tan, LLC, Tan International Corporation, Four Seasons Sales and Service, Inc., Stay Tan North, Inc. and John Does 1-5 as follows:

1.    For a judgment that defendants have tortuously interfered with plaintiff's lawful contracts or their reasonable expectation of prospective economic advantage, or both;

2.      For a judgment that defendants have engaged in a contract, arrangement or combination in violation of law;

3.      For consequential damages to be proven at trial;

4.      For punitive damages;

5.      For treble damages as provided by law;

6.      For preliminary and permanent injunctive relief prohibiting defendants from continuing the violations of law set forth herein and from taking any punitive action against plaintiff, including but not limited to any action to deprive plaintiff of sources of supply for the maintenance of its lawful business, in retaliation for the filing of this lawsuit;

7.      For a declaration that plaintiff's use of the various trademarks and alleged trademarks associated with the New Sunshine in connection with the sale of those products is fair use in and does not infringe any trademark or other right held by any defendant;

8.      For an order that defendants, their officers, directors, servants, employees, attorneys, agents, representatives, distributors, and all persons in active concert or participation with them, be enjoined and restrained permanently from interfering with plaintiff's sale of New Sunshine products and its use of the various trademarks and alleged trademarks associated with New Sunshine;

9.      For a declaration that defendants take nothing from plaintiff in respect of their threatened claims;

10.     For other remedies provided by statute and other applicable law;

11.     For reasonable attorneys' fees and costs; and

12.     Such other legal and equitable relief as the Court deems appropriate.

Respectfully submitted,

GOETZ FITZPATRICK LLP

By: _____

RONALD D. COLEMAN (RC 3875)

One Penn Plaza—Suite 4401
New York, New York 10119
(212) 695-8100
rcoleman@goetzfitz.com
*Attorneys for Plaintiff*

Dated: June 9, 2009
New York, New York